Filed 12/22/15  San Dieguito Community Council v. County of San Diego CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| SAN DIEGUITO COMMUNITY COUNCIL, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> COUNTY OF SAN DIEGO, <br><br> Defendant and Respondent; <br><br>_____ <br><br> RANCHO CIELO ESTATES, LTD., <br><br> Real Party in Interest and Respondent. | D067126 <br><br><br> (Super. Ct. No. 37-00066179-CU-WM-NC) |


APPEAL from a judgment of the Superior Court of San Diego County, Robert P. Dahlquist, Judge.  Affirmed.


Kevin K. Johnson, Jeanne L. MacKinnon and Heidi E. Brown for Plaintiff and Appellant.

Sheppard, Mullin, Richter & Hampton, John E. Ponder, Karin Dougan Vogel and Whitney Hodges for Defendant and Respondent and for Real Party in Interest and Respondent.

This case arises from the seventh amendment (Amendment) to the Rancho Cielo Specific Plan (Specific Plan) and the related addendum (Addendum) to the environmental impact report (EIR) for the real estate development of Rancho Cielo Estates (Development) in the San Dieguito community of San Diego County. Proposed by the developer, Rancho Cielo Estates, Ltd. (Rancho Cielo), and a related entity, the Amendment and Addendum concern five parcels within the Development — changing the land use designations of four of the five parcels and transferring a portion of one parcel's unused dwelling unit allotment to a neighboring parcel. In August 2013, the County of San Diego (County), through its Board of Supervisors (Board), approved the proposed modifications (2013 Project) and adopted the Addendum and the Amendment.

San Dieguito Community Council, Inc. (SDCC) filed the underlying action against the County as defendant/respondent, and Rancho Cielo and the related entity as real parties in interest, challenging the County's approval of the Amendment and the Addendum.[1] SDCC alleged that the County failed to comply with the California Environmental Quality Act (CEQA), Public Resources Code section 21000 et seq.,[2] and

---

[1]     The related entity did not appear in the trial court.

[2]     Further undesignated statutory references are to the Public Resources Code.

sought a writ of mandate directing the County to vacate its approval of the Amendment and Addendum.

The trial court denied SDCC's petition for writ of mandate and entered judgment against SDCC and in favor of the County and Rancho Cielo on all claims. SDCC focuses on three aspects of the Amendment and Addendum: (1) deletion of a commercial center within the Development; (2) deletion of a water reclamation system within the Development; and (3) transfer of some residential units from one parcel to another.

We will affirm the judgment.

I.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Amended Specific Plan*

The Development is located two miles east of Rancho Santa Fe, four miles southwest of the City of Escondido, four miles south of the City of San Marcos, seven miles east of Leucadia and Encinitas, and immediately north and west of Lake Hodges and the Del Dios area.

In 1981, based on an EIR, the County approved the Specific Plan (SP 81-04) for the Development. The Specific Plan covered 3,525 acres and allowed for, inter alia, approximately 890 residential units, two commercial centers, a fire station, and a water reclamation plant. The two commercial centers were the Village Center (within the Development) and the Neighborhood Commercial Center (just outside the gates to the westerly entrance).

3

Over the next 22 years, the Board approved six amendments to the Specific Plan. In general, the Development had been downsized to 2,668 acres and 719 residential units — 639 "country estates," 42 "village estates" and 38 "planned development units." The country estate residences were scattered throughout the Specific Plan area, the village estate units were clustered in the center of the Specific Plan area, and the planned development residences were located in the eastern portion of the Specific Plan area. These six amendments provided in part:

1984 Specific Plan Amendment (SPA) 84-01. This amendment redesigned the areas containing the village estates, the Village Center and the Neighborhood Commercial Center, increasing from 10 to 15 the number of developable acres in the Neighborhood Commercial Center. Along with this amendment, the County approved a 1984 supplemental environmental impact report (SEIR).

1984 SPA 84-05. This amendment added five additional country estate lots and redesigned 10 other country estate lots — none of which affect the two parcels (H and VC) or the water reclamation system at issue in the appeal. Along with this amendment, the Board adopted a negative declaration.

1996 SPA 96-001. This amendment reduced certain residential lot sizes within the country estates and relocated the fire station from the Village Center to the Neighborhood Commercial Center. Along with this amendment, the Board approved an addendum to the EIR and SEIR.

2001 SPA 98-001. This fourth amendment was approved primarily to respond to changes resulting from the acquisition of a right-of-way for and the construction of a

4

pipeline by the Olivenhain Municipal Water District (OMWD) for its water storage project, by which the OMWD connected several existing water storage reservoirs.[3]  A related approval included adding two, deleting seven and relocating two country estate lots on different parcels.  Along with this amendment, the Board approved an addendum to the 1981 EIR and the 1984 SEIR.

2002 SPA 00-006.  This fifth amendment further considered OMWD's project and OMWD's provision of water and sewer service for the Development, including the construction of an OMWD pump station within in the Development by which wastewater would be pumped to an offsite treatment plant.  In response to OMWD's water storage project, this amendment also allowed for the transfer of four lots from one side of a creek to the other side.  Along with this amendment, the Board approved an addendum to the 1981 EIR and the 1984 SEIR.

2003 SPA 00-003.  This amendment transferred 147 acres, including 46 country estate lots, and relocated a proposed sewer pump from the Specific Plan area to a newly created area, the Cielo del Norte Specific Plan, outside the Development.  The Board approved the environmental effects of this amendment in an August 2003 EIR submitted in support of the Cielo del Norte Specific Plan.[4]

---

[3]     OMWD's project is described as a system of reservoirs, water treatment plant, pipelines and a dam intended to enhance water delivery.

[4]     The 2003 EIR in support of the Cielo del Norte Specific Plan is not at issue in this appeal.

5

Thus, by 2003 the Specific Plan and the six SPA's (collectively, the Amended Specific Plan) approved final maps creating parcels H and Village Center (parcel VC), as well as construction of 528 residential units, including 42 village estates on parcel H. Tens of millions of dollars of infrastructure had been completed, and approximately 200 houses had been built.

B.     *The Amendment and the Addendum*

As relevant to this appeal, the 2013 Project proposed by the Amendment (1) focused on parcel H, which had allowed for the development of 42 village estate units, and parcel VC, which had allowed for the development of the Village Center; and (2) reclassified the water reclamation facility to country estates and the reclaimed water reservoir sites to open space for biological preservation. More specifically, the 2013 Project proposed reducing the residential units on parcel H from 42 to 24 (17 on parcel H and seven transferred to parcel VC) and deletion of the water reclamation facility.

County staff explained (1) that the water reclamation system was no longer necessary, because OMWD was already providing all the water and sewer services for the Amended Specific Plan area, and (2) that the density of the overall Amended Specific Plan would remain at the approved 0.27 dwelling units per acre. County staff also conducted environmental review and advised that the 2013 Project would not cause any new significant environmental impacts that were not previously considered and, as appropriate, mitigated in the Amended Specific Plan.

In May 2013, by a vote of 8-0-1, the San Dieguito Community Planning Group unanimously recommended approval of the 24 single-family homes and the elimination

6

of the water reclamation system. In July 2013, by a vote of 5-0-2, the County's planning commission recommended approval of the zoning reclassifications required to effect the 2013 Project. In August 2013, by a vote of 5-0, the Board approved the 2013 Project and adopted the Amendment and Addendum, along with two related tentative maps and two related site plans.[5]

C.      *The Trial Court Proceedings*

In September 2013, SDCC filed the underlying action against the County and Rancho Cielo (together, Respondents). In a verified petition for writ of mandate and complaint for declaratory and injunctive relief, as relevant to the issues on appeal SDCC alleged that in the process of approving the 2013 Project — i.e., in adopting the Amendment and Addendum — the County violated CEQA.[6] The County and Rancho Cielo filed their respective responses and answers to SDCC's petition/complaint.

---

[5]      In the formal notice approving the 2013 Project, the County described the 2013 Project as follows: "The proposed project includes five parcels, with a Specific Plan Amendment to the Rancho Cielo Specific Plan for the change in land use designations to four out of the five parcels: Three parcels changed from water reclamation to biological open space and one parcel changed from Village Center to Village Estates. Additionally, the project includes the subdivision of two parcels, which are proposed for development of 24 single family lots; 17 lots within Parcel H and seven lots within the Village Center Parcel, with a density transfer of seven lots from Parcel H. Zoning Reclassifications and site plans are also included to implement the Specific Plan Amendment."

[6]      To the extent SDCC alleged other claims in its petition/complaint, we do not reach them, because SDCC has not asserted error related to them in its opening brief. (*Medrazo v. Honda of North Hollywood* (2012) 205 Cal.App.4th 1, 14 [appellant forfeits claim by not raising meaningful analysis of claim in opening brief].)

Following full briefing based on a complete record of the administrative proceedings, the trial court entertained oral argument and took the matter under submission. In October 2014, the court issued a lengthy minute order, discussing and ruling on the various issues raised in the briefing. As applicable to the issues on appeal, the minute order provided as follows: (1) the court reviewed the 2013 Project under section 21166 and the substantial evidence standard given the existing EIR, not determining de novo whether the 2013 Project was a "new" project to be reviewed under section 21151 and the fair argument standard;[7] and (2) the administrative record contained substantial evidence supporting the County's findings regarding water reclamation, traffic, fire and reallocation of residential units.

In November 2014, the court entered judgment denying relief to SDCC. In December 2014, SDCC timely appealed.

II.

DISCUSSION

In an appeal from judgment following a petition for writ of mandate in a CEQA case, " '[o]ur task on appeal is "the same as the trial court's." [Citation.] Thus, we conduct our review independent of the trial court's findings.' [Citation.] Accordingly, we examine the [agency's] decision, not the trial court's." (*Banker's Hill, Hillcrest, Park West Community Preservation Group v. City of San Diego* (2006) 139 Cal.App.4th 249, 257 (*Banker's Hill*).)

---

[7]    We will discuss these statutes and standards in the Discussion, *post*.

SDCC raises the following issues on appeal: (1) whether the County was required to review the 2013 Project under section 21151, rather than under section 21166; (2) whether the County failed to analyze properly the deletion of previously approved mitigation measures; (3) whether consideration of the 2013 Project required the County to prepare an EIR or SEIR rather than an addendum; (4) whether the findings in the Addendum are supported by substantial evidence in the administrative record; and (5) whether the Addendum contains a significant error requiring court intervention.

Before analyzing these issues, we will first present a brief overview of CEQA and establish the appropriate standard of review.

A.     *CEQA Law*

The policy of the state of California is that "the long-term protection of the environment . . . shall be the guiding criterion in public decisions." (§ 21001, subd. (d).) To this end, " ' "[t]he overriding purpose of CEQA is to ensure that agencies regulating activities that may affect the quality of the environment give primary consideration to preventing environmental damage." ' " (*Keep Our Mountains Quiet v. County of Santa Clara* (2015) 236 Cal.App.4th 714, 729.) In order to implement this policy and purpose, CEQA and its Guidelines[8] "have established a three-tiered process to ensure that public

_____

[8]     Codified at title 14, chapter 3, of the California Code of Regulations (14 Cal. Code Regs. § 15000 et seq.), the Guidelines are regulations authorized by section 21083 and adopted by the Secretary of the Natural Resources Agency to implement CEQA. (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 319, fn. 4.) When interpreting CEQA, " 'we accord the Guidelines great weight except where they are clearly unauthorized or erroneous.' " (*Ibid.*) For

9

agencies inform their decisions with environmental considerations." (*Davidon Homes v. City of San Jose* (1997) 54 Cal.App.4th 106, 112; see Guidelines, § 15002, subd. (k) [describing three-tier process].)

The first tier " 'requir[es] that an agency conduct a preliminary review in order to determine whether CEQA applies to a proposed activity.' " (*Banker's Hill*, *supra*, 139 Cal.App.4th at pp. 257-258; see Guidelines, § 15060.) Unless exempt under the Guidelines, in which event " 'no further environmental review is necessary,' " the agency proceeds to the second tier and "conducts an initial study to determine if the project *may* have a significant effect on the environment."[9] (*Banker's Hill*, at p. 258; see § 21080, subd. (d); Guidelines, § 15063, subd. (a).) If the study concludes there will be no significant effect, the agency issues a negative declaration; if there will be a significant effect, the process advances to the third tier, and the agency prepares an EIR. (*Banker's Hill*, at pp. 258-259; see Guidelines, § 15063, subd. (b).)

However, this three-tiered process is not required for every step taken during the development of a project, even where the proposal may have an effect on the

convenience, when we cite to a section of the Guidelines, we will be referring to a section of title 14 of the California Code of Regulations (e.g., Guidelines § 15000, et seq.).

[9]    " 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance. An economic or social change by itself shall not be considered a significant effect on the environment. A social or economic change related to a physical change may be considered in determining whether the physical change is significant." (Guidelines, § 15382.)

environment. "Once a proper EIR has been prepared, no [SEIR] is required unless (1) '[s]ubstantial changes' are proposed in the project, requiring 'major revisions' in the EIR; (2) substantial changes arise in the circumstances of the project's undertaking, requiring major revisions in the EIR; or (3) new information appears that was not known or available at the time the EIR was certified. (§ 21166; see also Guidelines, § 15162; [citation].) '[S]ection 21166 comes into play precisely because in-depth review has already occurred, the time for challenging the sufficiency of the original EIR has long since expired (§ 21167, subd. (c)), and the question is whether circumstances have changed enough to justify repeating a substantial portion of the process.' " (*Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 54-55.)

Rather, where the proposed project requires "some changes or additions" to the EIR, but none of the above-described three conditions in section 21166 has occurred, the agency "shall prepare an addendum to a previously certified EIR." (Guidelines, § 15164, subd. (a).) "An addendum need not be circulated for public review but can be included in or attached to the final EIR or adopted negative declaration." (*Id.*, subd. (c).) "The decision-making body shall consider the addendum with the final EIR or adopted negative declaration prior to making a decision on the project. [¶] . . . A brief explanation of the decision not to prepare a subsequent EIR pursuant to Section 15162 should be included in an addendum to an EIR, the lead agency's required findings on the project, or elsewhere in the record. The explanation must be supported by substantial evidence." (*Id.*, subds. (d), (e).)

11

B.      *Standard of Review*

Section 21168 provides in relevant part that, where a plaintiff/petitioner like SDCC alleges noncompliance with CEQA in any action or proceeding to review a public agency's determination "*made as a result of a proceeding in which by law a hearing is required to be given,* [*where*] *evidence is required to be taken and discretion in the determination of facts is vested in a public agency*, . . . [¶] . . . the court shall not exercise its independent judgment on the evidence but shall only determine whether the act or decision is supported by substantial evidence in the light of the whole record." (Italics added.)  In contrast, in such an action or proceeding, "*other than an action or proceeding under Section 21168*, . . . the inquiry shall extend only to whether there was a prejudicial abuse of discretion."  (§ 21168.5, italics added.)

In distinguishing the two types of cases, our Supreme Court has explained, "[s]ection 21168.5 . . . governs traditional mandamus actions," whereas "[s]ection 21168 establishes the standard of review in administrative mandamus cases."  (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392, fn. 5.)  The present action is one of administrative mandamus, because the County "conduct[ed] a hearing at which evidence was taken in a judicial (adjudicative) sense." (*Ibid.*)  Thus, pursuant to section 21166, we will apply the substantial evidence standard of review.[10]

---

10      SDCC argues for a de novo standard of review of the threshold issue whether the 2013 Project was a "new" project not considered in the Specific Plan to be analyzed under section 21151, as opposed to a modification of the Specific Plan to be analyzed

12

In this context, "substantial evidence includes fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact," but does not include "argument, speculation, unsubstantiated opinion or narrative, evidence that is clearly inaccurate or erroneous, or evidence of social or economic impacts that do not contribute to, or are not caused by, physical impacts on the environment."  (§ 21080, subd. (e); see Guidelines, § 15384, subd. (a) [substantial evidence means "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached"].)  The application of this standard of review is no different in CEQA actions than in other cases:

> " 'In reviewing the evidence on . . . appeal all conflicts must be resolved in favor of the [prevailing party], and all legitimate and reasonable inferences indulged in to uphold the [finding] if possible.  It is an elementary, but often overlooked principle of law, that when a [finding] is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the [finding].  When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.' "

(*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571 [CEQA action], quoting from *Crawford v. Southern Pac. Co.* (1935) 3 Cal.2d 427, 429 [negligence action following collision of train and truck].)

We determine de novo whether the agency used the correct CEQA procedures.

(*Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 131 (*Save Tara*).)

---

under section 21166.  We will elaborate on the application of the standard of review applied to this issue at part II.C.1., *post*.

13

C.      *Analysis of Issues on Appeal*

      1.      *Section 21166, Not Section 21151, Applies to the County's Review of the 2013 Project*

SDCC argues that the 2013 Project was not a modification to an existing plan that had already received environmental review, but rather an altogether *new* project under CEQA, requiring the County to have conducted an *initial* determination whether the project may have a significant effect on the environment under section 21151. In so arguing, SDCC emphasizes the different review an agency must provide of a new project under section 21151, as opposed to the review of an adjustment to an existing project under section 21166.

Where a new project is presented (and not exempt or subject to a negative declaration), section 21151 provides in part that "local agencies shall prepare, or cause to be prepared by contract, and certify the completion of, an [EIR] on any project that they intend to carry out or approve which *may have a significant effect on the environment*." (*Id.*, subd. (a), italics added.) For purposes of section 21151, "a public agency must prepare an EIR whenever substantial evidence supports a fair argument that a proposed project 'may have a significant effect on the environment' "; this is known as the "fair argument" standard. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123.) This is a " 'low threshold' " for the preparation of an EIR, reflecting a preference to resolve doubts in favor of full environmental review. (*Nelson v. County of Kern* (2010) 190 Cal.App.4th 252, 282.)

14

In contrast, *once an EIR has been certified*, section 21166 expressly precludes a subsequent or supplemental EIR absent changed circumstances or new information.[11] Section 21166's "presumption against additional environmental review" (*San Diego Navy Broadway Complex Coalition v. City of San Diego* (2010) 185 Cal.App.4th 924, 928 (*San Diego Navy*)) implements the legislative policy favoring "prompt resolution of challenges to the decisions of public agencies regarding land use" (*Citizens for a Megaplex-Free Alameda v. City of Alameda* (2007) 149 Cal.App.4th 91, 111 (*Citizens*)).  Section 21166 applies a deferential standard, " 'because in-depth review has already occurred, [and] the time for challenging the sufficiency of the original EIR has long since expired.' "  (*Moss v. County of Humboldt* (2008) 162 Cal.App.4th 1041, 1050 (*Moss*).)

Respondents argue that SDCC forfeited this argument, because prior to this appeal SDCC did not allege or argue that the County violated section 21151 by failing to consider whether the 2013 Project was a new project.  Respondents rely on section 21177, subdivision (a) (to assert grounds for noncompliance with CEQA in lawsuit, they must be presented to agency prior to agency determination) and *Sea & Sage Audubon Society, Inc. v. Planning Com.* (1983) 34 Cal.3d 412, 417 (*Sea & Sage*) (issues not raised in trial court cannot be raised on appeal).   Although SDCC did not present the

---

11      After preparation of an EIR for a project, the responsible agency is precluded from requiring a subsequent or supplemental EIR unless "[s]ubstantial changes are proposed in the project which will require major revisions of the [EIR]"; "[s]ubstantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the [EIR]"; or "[n]ew information, which was not known and could not have been known at the time the [EIR] was certified as complete, becomes available."  (§ 21166.)  This standard is repeated at Guidelines, section 15162.

identical argument by identifying the specific statutes at issue, given the record Respondents will not be prejudiced by our consideration of SDCC's legal argument as to the appropriate standard of review. In the initial proceedings SDCC argued to the County that Rancho Cielo's proposal "may result in environmental impacts which have not been analyzed as required by CEQA" — which, as we discussed *ante*, strongly suggests consideration of section 21151. Further, in initiating the underlying action, SDCC alleged as error the County's failure to prepare a new (i.e., not a supplemental) EIR. Consistently, in the trial court briefing, SDCC expressly argued that the 2013 Project was a new project to which section 21166 was inapplicable, citing authority that advocated for application of section 21151. Finally, Respondents briefed the issue both in the trial court and on appeal; notably, in the trial court, Respondents did not argue that SDCC forfeited the issue, and the court ruled on the merits.

We agree with SDCC that we must first determine whether the proposed changes are a "project" subject to initial review under CEQA. (See *Save Tara*, *supra*, 45 Cal.4th at p. 131.) In this context, a project subject to CEQA is "[a]n activity directly undertaken by any public agency" which "may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment." (§ 21065, subd. (a); see Guidelines, §§ 15002, subd. (d), 15378.) SDCC contends the project is merely the 2013 Project, whereas Respondents contend the project is the entire Amended Specific Plan. To assist us, the Guidelines advise that " '[p]roject' means the *whole* of an action . . . ." (Guidelines, § 15378, subd. (a), italics added.)

16

The parties disagree as to the standard of review we are to apply in determining whether the County properly analyzed the 2013 Project under section 21166, rather than under section 21151. SDCC argues for a de novo standard, whereas Respondents contend the substantial evidence standard applies. They are not the only ones who disagree: "Courts have reached different conclusions about the appropriate level of judicial scrutiny to be applied to an agency's determination about whether a project is 'new,' such that section 21151 applies, or whether it is a modification of a previously reviewed project, such that section 21166 applies." (*Moss*, *supra*, 162 Cal.App.4th at p. 1051.)

In *Save Our Neighborhood v. Lishman* (2006) 140 Cal.App.4th 1288 (*Save Our Neighborhood*), the Third District held that this threshold issue is a question of law for the court.[12] (*Save Our Neighborhood*, at p. 1297.) A year later, in *Mani Brothers Real Estate Group v. City of Los Angeles* (2007) 153 Cal.App.4th 1385 (*Mani Brothers*), Division Two of the Second District disagreed with this aspect of *Save Our Neighborhood* in cases in which there has been a previously certified EIR: "Treating the issue as a question of law, as the court did in *Save Our Neighborhood*, inappropriately undermines the deference due the agency in administrative matters. That principle of

---

[12] Other decisions suggest the same conclusion, even if in dictum. (*Lincoln Place Tenants Assn. v. City of Los Angeles* (2005) 130 Cal.App.4th 1491, 1503 (*Lincoln Place*) ["The question of what constitutes a 'project' for purposes of CEQA review is a question of law which we review de novo."]; *Association for a Cleaner Environment v. Yosemite Community College Dist.* (2004) 116 Cal.App.4th 629, 637; *Black Property Owners Assn. v. City of Berkeley* (1994) 22 Cal.App.4th 974, 984; *Kaufman & Broad-South Bay, Inc. v. Morgan Hill Unified School Dist.* (1992) 9 Cal.App.4th 464, 470.)

17

deference is otherwise honored by the substantial evidence test's resolution of any

' "reasonable doubts in favor of the administrative finding and decision." ' "[13]  (*Mani*

*Brothers*, *supra*, 153 Cal.App.4th at p. 1401.)[14]

For purposes of the present dispute, we agree with the authorities that review for

substantial evidence the agency's threshold decision to proceed under section 21166

rather than under section 21151.  In particular, we agree with the logic and reasoning in

*Mani Brothers*.  Initially, to consider as a question of law whether the proposed changes

are a new project or a modification to an approved project, as in *Save Our Neighborhood*,

---

[13]    Other decisions suggest the same conclusion, even if in dictum.  (*Latinos Unidos de Napa v. City of Napa* (2013) 221 Cal.App.4th 192, 202 [substantial evidence test used to evaluate agency's decision to proceed under § 21166 rather than under § 21151]; *Abatti v. Imperial Irrigation Dist.* (2012) 205 Cal.App.4th 650, 675 (*Abatti*); *Moss*, *supra*, 162 Cal.App.4th 1041, 1052, fn. 6, 1058; *Citizens*, *supra*, 149 Cal.App.4th at p. 110; *American Canyon Community United for Responsible Growth v. City of American Canyon* (2006) 145 Cal.App.4th 1062, 1083; *Santa Teresa Citizen Action Group v. City of San Jose* (2003) 114 Cal.App.4th 689, 703; *Friends of Davis v. City of Davis* (2000) 83 Cal.App.4th 1004, 1018; *A Local & Regional Monitor v. City of Los Angeles* (1993) 12 Cal.App.4th 1773, 1793; *Stone v. Board of Supervisors* (1988) 205 Cal.App.3d 927; *Fund for Environmental Defense v. County of Orange* (1988) 204 Cal.App.3d 1538, 1544 (*Fund for Environmental Defense*); *Bowman v. City of Petaluma* (1986) 185 Cal.App.3d 1065, 1071 (*Bowman*).)

[14]    Under Evidence Code sections 452, subdivision (d)(1) and 459, we note that the California Supreme Court has granted review in *Friends of the College of San Mateo Gardens v. San Mateo Community College Dist.* (Jan. 15, 2014, S214061).  That case includes the issue of the proper standard of review when a lead agency is presented with a proposed modification to a project and performs a subsequent environmental review and prepares an SEIR, a subsequent negative declaration, or an addendum and raises the question:  Is the agency's decision reviewed under a substantial evidence standard of review (*Mani Brothers*, *supra*, 153 Cal.App.4th at p. 1401) or subject to an initial de novo determination whether the modification of the project constitutes a new project altogether (*Save our Neighborhood*, *supra*, 140 Cal.App.4th at p. 1297)? (<http://appellatecases.courtinfo.ca.gov/search/case/mainCaseScreen.cfm?dist=0&doc_id =2059337&doc_no=S214061> [as of Dec. 21, 2015].)

"inappropriately undermines the deference due the agency in administrative matters." (*Mani Brothers*, *supra*, 153 Cal.App.4th at p. 1401.) Moreover, "decid[ing] as a matter of law if the later project is a revision of a previously approved project or an entirely new project, *without consideration of the environmental impacts of the later project*, violates the legislative mandate that 'courts . . . shall not interpret this division or the state guidelines . . . in a manner which imposes procedural or substantive requirements beyond those explicitly stated in this division or in the state guidelines.' " (*Ibid.*, quoting from § 21083.1.) Labeling a project " 'new' " or " 'modified' " based on size, nature or character "imposes a new analytical factor beyond the framework of CEQA" — particularly where (as here) there is a previously certified EIR — since such factors are "meaningful *only* to the extent they affect the environmental impacts of a project." (*Mani Brothers*, at p. 1401.)

We must now determine whether substantial evidence supports the County's decision to proceed under section 21166 — where an SEIR may not be required, unless "[s]ubstantial changes are proposed in the project which will require major revisions of the previous EIR . . . *due to the involvement of new significant, environmental effects or a substantial increase in the severity of previously identified significant effects*." (Guidelines, § 15162, subd. (a)(1), italics added; see *Mani Brothers*, *supra*, 153 Cal.App.4th at pp. 1401-1402.)

In applying the substantial evidence standard, we presume the County's decision is supported by substantial evidence, and SDCC bears the burden of proving otherwise. (*Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1497.) As in any other

19

case being reviewed for substantial evidence, an appellant in a CEQA appeal may not refer only to the evidence in support of the appellant's position (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 626); an appellant must describe in its opening brief the evidence favorable to the agency, show why it is lacking, and failing to do so is fatal to the challenge on appeal (*Citizens*, *supra*, 149 Cal.App.4th at pp. 112-113). The reason for this is that "if the appellants fail to present us with all the relevant evidence, then the appellants *cannot* carry their burden of showing the evidence was insufficient to support the agency's decision because support for that decision may lie in the evidence the appellants ignore." (*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 749-750 (*State Water*).) Where an opening brief fails to recite and discuss the record that supports the agency's decision, the appellant is deemed to have forfeited the substantial evidence argument. (*Id.* at p. 749.)

Here, SDCC argues only for de novo review of this issue, not presenting (or arguing against the substantiality of) the evidence in support of the County's decision to proceed under section 21166. In particular, SDCC did not set forth the evidence in support of a finding that the 2013 Project was a modification of the Amended Specific Plan as opposed to a new project altogether. By relying only on evidence in the record that it contends will support a finding that the 2013 Project was a new project, SDCC has forfeited consideration of whether the County erred in proceeding under section 21166.

In any event, although not required to do so (*Citizens*, *supra*, 149 Cal.App.4th at p. 113), we have reviewed the record and are satisfied that it contains substantial evidence that the "whole of the action" (Guidelines, § 15378, subd. (a)) is the Amended

20

Specific Plan and the 2013 Project merely modifies it; the 2013 Project is not an entirely new project. Moreover, even if we review the issue de novo as suggested by SDCC and *Save Our Neighborhood*, our analysis and conclusion are the same *given* Save Our Neighborhood*'s description of when an addendum may and may not be used* (i.e., when the proposed activity is a new project): An addendum may be used where there is "*only one project that under*[*goes*] *changes* after completion of the initial environmental review," but may not used where "*the project is replaced* by another project that happens to be similar in nature."[15] (*Save Our Neighborhood*, *supra*, 140 Cal.App.4th at p. 1300, italics added.)

Here, the Village Center, the development of residential units on parcel H, and the water reclamation facility were all within the scope of the previously completed environmental reviews for the Amended Specific Plan — i.e., one project covering 2,668 acres — at the time the County reviewed the 2013 Project. As indicated in the 1984 SEIR, the Amended Specific Plan had approved future development of the Village Center

_____

15     In *Save Our Neighborhood*, the agency approved in 1997 the North Point Project, which called for the construction of a 106-unit motel, restaurants, lounge, gas station, convenience store and carwash on the property. (*Save Our Neighborhood*, *supra*, 140 Cal.App.4th at p. 1291.) The North Point Project was never constructed, and in 2004 a different developer submitted plans for the Gateway Project, which called for the construction of a 102-unit motel with convention facilities and a gas station with a convenience store and carwash. (*Id.* at pp. 1291-1292.) The court ruled that the agency erred by reviewing the proposal as a modification to an existing project (under § 21166) rather than as a new project (under § 21151) based on the de novo determination that the Gateway Project was "a new project" that merely had many of the same characteristics as an earlier never developed project for the same site. (*Id.* at p. 1297.) In contrast, using the language of *Save Our Neighborhood*, here we have "only one project that underwent changes after completion of the initial environmental review." (*Id.* at p. 1300.)

21

and the Neighborhood Commercial Center; between 1984 and 2013 the uses originally planned for the Village Center were relocated either to the Neighborhood Commercial Center or elsewhere in the Development; and the 2013 Project proposed deleting the Village Center. Similarly, the 1984 SEIR had approved development of 42 residential units on parcel H; over the years, the total number of units in the Development decreased, and many were redesigned and relocated; and the 2013 Project further modified the Development, reducing those 42 residential units to 24 and transferring seven to parcel VC. Likewise, whereas the original 1981 EIR had allowed for the future development and permitting of a water reclamation system to service the Development, the 2013 Project reclassified the physical facility to country estates and the reservoir sites to open space for biological preservation. These three changes do not involve replacement of one project by another; all are part of only one project, the Amended Specific Plan, after completion of its initial environmental review.

Thus, regardless whether we review the decision to proceed under section 21166 for substantial evidence or de novo, the County properly analyzed the 2013 Project under section 21166, not under section 21151.[16] The whole of the action is the entire

---

16   Because we conclude that the Board properly reviewed the 2013 Project under section 21166, we do not reach SDCC's various arguments as to the purported errors of the review under section 21151.

Development, as set forth in the Amended Specific Plan, and the 2013 Project merely modified it; the 2013 Project was not an altogether new project.[17]

### 2. The Record Contains Substantial Evidence Supporting the Deletion of Certain Previously-adopted Mitigation Measures

SDCC argues that the use of the Addendum (as opposed to an SEIR) to deal with the 2013 Project's modifications related to the water reclamation system and the Village Center violated CEQA safeguards associated with implementation of earlier mitigation measures. We disagree.

Initially, we accept SDCC's premise that both the water reclamation system and the Village Center were included in the 1981 EIR as mitigation, or at least as partial mitigation, factors.[18] SDCC is further correct in relying on section 21081.6 as a statutory directive to agencies to ensure that mitigation measures be implemented.

---

[17] In a different section of its opening brief (toward the end), SDCC argues that *because the 2013 Project is a new project*, writ relief should be granted requiring the County to prepare an EIR, an SEIR or a negative declaration according to section 21151, subdivision (a). However, since the 2013 Project is not a new project, section 21151 and its requirements for documentation are not implicated.

[18] In emphasizing the mitigating impacts of water reclamation in the original 1981 EIR, SDCC suggests that "since that time drought and water shortages have become even more acute." In support of that comment, SDCC asks us to take judicial notice of an executive order dated April 1, 2015, and an emergency regulation adopted May 5, 2015 — documents that SDCC contends demonstrate that water saving efforts are of statewide environmental concern. Those documents were not before either the Board at the time it approved the Amendment and Addendum or the superior court at the time it ruled on SDCC's complaint/petition. Accordingly, we deny SDCC's motion for judicial notice. (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 379, fn. 2 [reviewing courts do not take judicial notice of evidence not presented to the fact-finding tribunal "absent exceptional circumstances"].)

23

(*Lincoln Place*, *supra*, 130 Cal.App.4th at p. 1508.)  Once mitigating conditions are imposed by an EIR, however, the responsible agency is not precluded from modifying or deleting them.  (*Ibid.*; *Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 359 (*Napa Citizens*) ["we find nothing in established law or in logic to support the conclusion that a mitigation measure, once adopted, never can be deleted"].)

However, SDCC is wrong in suggesting that any such modification or deletion may be accomplished exclusively through an SEIR.  As we introduced *ante*, an SEIR is required *only* upon the agency's determination that the proposed activity involves either substantial changes or new information.  (§ 21166; Guidelines, § 15162, subd. (a).)  Further, the Guidelines expressly authorize the use of an addendum "if some changes or additions are necessary [to the EIR] but none of the conditions described in Section 15162 calling for preparation of a subsequent EIR have occurred."  (Guidelines, § 15164, subd. (a); see *Mani Brothers*, *supra*, 153 Cal.App.4th at pp. 1397-1399 [use of an addendum versus an SEIR].)  This is not a new concept; for almost 30 years now, courts have approved the use of an addendum to evaluate changes to an EIR-approved project.  (*Bowman*, *supra*, 185 Cal.App.3d at p. 1081 [amendments to subdivision map]; *Citizens Against Airport Pollution v. City of San Jose* (2014) 227 Cal.App.4th 788, 812 [amendments to airport master plan].)

Mitigation measures in an EIR may be modified or deleted if the responsible agency provides a legitimate reason for making the change and substantial evidence supports the reason.  (*Napa Citizens*, *supra*, 91 Cal.App.4th at p. 359.)  Stated differently,

24

the agency may not delete a mitigation measure without reviewing the continuing need for it, stating the agency's reasons for the change, and supporting the decision with substantial evidence. (*Sierra Club v. County of San Diego* (2014) 231 Cal.App.4th 1152, 1167-1168 (*Sierra Club*).) The agency must include the reasons for and the effect of deleting a mitigation measure "in a supplemental EIR *or other CEQA document such as an addendum*." (1 Kostka & Zischke, Practice Under the California Environmental Quality Act (Cont.Ed.Bar 2d ed. 2015) § 14.35, p. 14-45, italics added.)

Mitigation measures must be "feasible." (Guidelines, § 15126.4, subd. (a)(1).) In this context, " '[f]easible' means capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (§ 21061.1.) Correspondingly, "no public agency shall . . . carry out a project for which an [EIR] has been certified" where "economic, legal, social, technological, or other considerations . . . make *infeasible* the mitigation measures . . . identified in the [EIR]." (§ 21081, subd. (a)(3), italics added.) Before eliminating a previously-adopted mitigation measure, therefore, the responsible agency must first find that it is "infeasible" or "ill-advised" according to *Napa Citizens*, *supra*, 91 Cal.App.4th at page 359 (land use plan), or "impractical or unworkable" according to *Lincoln Place*, *supra*, 130 Cal.App.4th at pages 1508-1509 (all CEQA projects). In *Napa Citizens*, for example, the Court of Appeal agreed that prior mitigation conditions could be deleted, because they were "infeasible" and "ill-advised" based on the substantial evidence establishing (1) deleting a mitigation condition regarding traffic would result in "only a minor contributing factor" to the otherwise adverse impact of the project; (2) the agency

25

lacked the funds to implement the previously-approved mitigation conditions; and (3) the agency lacked control over effecting the conditions. (*Napa Citizens*, at p. 359.)

We will now turn to the record to determine whether substantial evidence supports the deletion of mitigation measures related to the water reclamation facility and the Village Center. Initially, we note that SDCC improperly focuses on why the two mitigation measures remain feasible, rather than the substantiality of the evidence supporting their deletion — potentially forfeiting consideration of the issue on appeal. (*State Water*, *supra*, 136 Cal.App.4th at p. 749.) Nonetheless, we will review the evidence in support of the Amendment and Addendum.

        a.     *Water Reclamation System*

In 1981, the original EIR noted that "the costs and energy usage of producing reclaimed water can become excessive," concluding that any wastewater reclamation at the Development should be "both satisfactory to the regulatory agencies and economical." Over the years, the County considered the satisfaction of both the regulators and the economics.

In 1984, the County's Environmental Review Board commented that "it remains unclear whether the Regional Water Quality Control Board standards can be met," warning that any failures in the reclamation system "would degrade the local groundwater and could imbalance the ecology of the San Dieguito or San Elijo Lagoons." In the same report, the Department of Public Works (the then-proposed operator of the Development's water reclamation facilities) expressed concerns that the potential water

26

reclamation facility "is too costly, will consume too much energy, and may not be feasible."

By the time of the County's consideration of 2013 Project, the OMWD was providing all necessary water and sewer services to the Development. This included sufficient water for both " 'firewise landscaping' " and a fuel modification plan, the purpose of which was to "mak[e] all proposed structures safe from future wildland wildfires." (Italics omitted.)

In both its initial study and the Addendum itself, the County disclosed the deletion of the water reclamation facility and explained its reasoning as follows: "The OMWD serves the [Development] with water and sewer service and these reclamation facilities are no longer required."

Based on the 1981 EIR's statement that such further analysis will be necessary after the availability of plans and the application for permits, SDCC suggests that additional environmental review of the water reclamation plant was necessary before the water reclamation system could be deleted. We disagree. The 2013 Project did not propose to develop the facility without environmental review; prior to performing this environmental review, the 2013 Project substituted something else in place of the system based on an analysis of infeasibility, and that is the decision we review for substantial evidence on appeal. Likewise, we disagree with SDCC's suggestion that any time a mitigation measure is deleted, the "unmitigated impact remains" or an EIR or SEIR is necessarily required. Here, the 2013 Project proposed that alternatives already in effect

27

resulted in the lack of a need for the water reclamation plant; and that is the decision we review for substantial evidence on appeal.

Based on the foregoing, the County reviewed the continuing need for the water reclamation facility and the reason for deleting the facility; and the administrative record contains substantial evidence supporting the change. (*Napa Citizens*, *supra*, 91 Cal.App.4th at p. 359; *Sierra Club*, *supra*, 231 Cal.App.4th at pp. 1167-1168.) Accordingly, SDCC did not establish error related to the deletion of the water reclamation facility.

        b.     *Village Center*

The 1981 EIR described two planned commercial centers: the Village Center "at the top of the ridge" within the Development, and the Neighborhood Commercial Center outside the gates of the western entrance. The Village Center was proposed to cover 10 acres, and its intended uses included a convenience market, contract postal station, restaurant and association offices and recreational facilities. The Neighborhood Commercial Center was intended to be occupied by a market, pharmacy, nursery and leasable office space.

Initially, we reject Respondents' argument that the Village Center was not a mitigation measure identified in the 1981 EIR. The record reference provided by Respondents is found under the major heading of "TRAFFIC CIRCULATION," following the subheading "IMPACTS," and within the subheading "MITIGATION" — where the EIR specifically mentions the Village Center as one aspect of the Development

28

that will serve as "partial mitigation to traffic impacts" by "reduc[ing] the number of trips onto external roads."

The 1984 SEIR described a relocation of the Village Center and a redesign of both the Village Center and the Neighborhood Commercial Center. The Village Center was moved to the southwest and reduced from 10 acres to six acres; the Neighborhood Commercial Center was expanded to cover use on both sides of the intersection outside the gates for its 50,000 square feet of commercial space on 10-15 developable acres.

By the time of the County's consideration of the 2013 Project, the proposed Village Center was potentially 5,000 square feet of commercial space, and 30,000 of the 50,000 square feet of commercial space in the Neighborhood Commercial Center within the Amended Specific Plan were vacant. In short, the evidence was that there was "no demand" for commercial development within the gated community. As one commissioner summarized (and the County planning official confirmed), "what was originally anticipated has actually turned out to not be needed and the market's driving that decision."

In addition, the County staff report advised that the recreational and association uses originally anticipated to be developed in the Village Center had already been relocated and developed to the south — thereby avoiding any loss of such uses.

Accordingly, we are satisfied both that the County reviewed the continuing need for the development of the Village Center and the reason for deleting it and that the administrative record contains substantial evidence supporting the change. (*Napa*

29

*Citizens*, *supra*, 91 Cal.App.4th at p. 359; *Sierra Club*, *supra*, 231 Cal.App.4th at pp. 1167-1168.)

SDCC argues that the 1981 EIR promoted the Village Center as one way of reducing external trips onto roads adjacent to the Development, whereas the 2013 Project deleted the Village Center without an updated traffic study. Absent such a study, SDCC continues, development of the Village Center remains feasible. However, the fact that the record may contain evidence potentially supporting a finding that development of the Village Center is feasible is irrelevant to our role, which is limited to determination of the sufficiency of the evidence *in support of the finding actually made* (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631 (*Howard*)) — namely, that the Village Center was no longer necessary. Likewise, SDCC's characterization of the evidence related to the lack of demand for commercial space as "conflicting information" is not persuasive. "[T]he test is *not* the presence or absence of a substantial conflict in the evidence. Rather, it is simply whether there is substantial evidence in favor of the respondent." (*Ibid.*)

For these reasons, SDCC did not establish error related to the deletion of the Village Center.

3. *SDCC Did Not Meet Its Burden of Establishing Error in the County's Use of an Addendum Rather Than an SEIR*

In this argument, SDCC accepts the County's use of section 21166 in evaluating the 2013 Project, but contends that the County erred in preparing an addendum rather than an SEIR. More specifically, SDCC argues that the 2013 Project's deletion of the

30

water reclamation facility and the Village Center are " 'substantial changes' " that " 'will require major revisions' " of the 1981 EIR, thereby necessitating an SEIR under section 21166.  We disagree.

Initially, we incorporate our discussion at part II.C.1., *ante*, emphasizing that where (as here) the agency is reviewing a potential modification to a project for which an initial EIR has already been prepared, section 21166 provides a "statutory presumption against additional environmental review." (*San Diego Navy*, *supra*, 185 Cal.App.4th at p. 934.)  " ' "The low threshold for requiring the preparation of an EIR in the first instance is no longer applicable; instead, agencies are prohibited from requiring further environmental review unless the stated conditions are met." ' "  (*Id.* at p. 935.)  This " ' "shift in the applicable policy considerations" ' " under section 21166 " ' "comes into play precisely because in-depth review has already occurred, . . . and the question is whether circumstances have *changed* enough to justify *repeating* a substantial portion of the process." ' "  (*Ibid*.)

In order for the changes to trigger the requirement that an SEIR be prepared, they must be "[s]ubstantial" and result in new or more severe "significant, environmental effects." (Guidelines, § 15162, subd. (a)(1) & (2); see *Fund for Environmental Defense*, *supra*, 204 Cal.App.3d at p. 1549 [addendum sufficient because changes did not raise new adverse environmental effects].)  Thus, proposed changes that are within the scope of a previously approved project do not trigger preparation of an SEIR under section 21166.  (See *Concerned Dublin Citizens v. City of Dublin* (2013) 214 Cal.App.4th 1301, 1318 (*Concerned Dublin Citizens*)) [where plan anticipated reallocation of

31

residential units within plan, shift of units from one location within the plan to another within the plan did not require SEIR].)

In reviewing the agency's determination that an addendum is sufficient under section 21166, "the test is whether the record as a whole contains substantial evidence to support a determination that the changes in the project were not so 'substantial' as to require 'major' modifications to the EIR." (*Bowman*, *supra*, 185 Cal.App.3d at p. 1075; see *Abatti*, *supra*, 205 Cal.App.4th at p. 675 [substantial evidence standard of review for decision that EIR not required]; § 21168.) In applying this standard, we " ' "are not reviewing the record to determine whether it demonstrates a possibility of environmental impact, but are viewing it in a light most favorable to the [agency's] decision in order to determine *whether substantial evidence supports the decision not to require additional review*." ' " (*Abatti*, at p. 675, italics added.)

Although no findings are required (*Citizens*, *supra*, 149 Cal.App.4th at p. 114), a "brief explanation of the decision not to prepare a subsequent EIR pursuant to Section 15162 should be included in an addendum." (Guidelines, § 15164, subd. (e).) Here, in the Addendum — under the heading "Environmental Review Update Checklist Form For [P]rojects with Previously Approved Environmental Documents," following two pages of background, a summary of the activities to be authorized by the Amendment (including a description of how the 2013 Project differs from Amended Specific Plan) and the disclosure that these activities would not result in "new" or "a substantial increase in severity" of environmental effects — the County provided the following brief explanation:

32

"No substantial changes are proposed in the [2013 P]roject and there are no substantial changes in the circumstances under which the project will be undertaken that will require major revisions to the previous EIR . . . due to the involvement of significant new environmental effects or a substantial increase in the severity of previously identified significant effects. [Guidelines, § 15162, subd. (a)(1) & (2).] Also, there is no 'new information of substantial importance' as that term is used in CEQA Guidelines Section 15162[, subdivision ](a)(3). Therefore, the previously certified EIR is adequate upon completion of an ADDENDUM."

This explanation of "no substantial changes" resulting in new or more severe "significant environmental effects" than in the 1981 EIR is sufficient and, as we explain, supported by substantial evidence. (Guidelines, § 15162, subd. (a)(1) & (2).)

a. *Water Reclamation*

In support of the Seventh Amendment's proposal to reclassify the water reclamation facility sites, County staff explained and provided evidence that the water reclamation system was no longer necessary. The OMWD fully served the Development by providing all necessary water and sewer services — including sufficient water for both " 'firewise landscaping' " and a fuel modification plan, the purpose of which was to "mak[e] all proposed structures safe from future wildland wildfires." (Italics omitted.)

SDCC is critical of the lack of evidence related to fire risks for which reclaimed water was to be used. However, SDCC's record reference for the threat of wildfires and the associated risks is to *the 1981 EIR* — which confirms that this risk is not a substantially changed circumstance for purposes of analyzing the Addendum under Guidelines, section 15162, subdivision (a) and the issue on appeal. (*Concerned Dublin Citizens*, *supra*, 214 Cal.App.4th at p. 1318 [proposed changes within the scope of a

33

previously approved project do not trigger preparation of an SEIR under § 21166].)
Further, SDCC fails to consider the Addendum, which contains a 105-page "Conceptual Fire Protection Plan" that fully sets forth evidence of the fire risks in the Development and how they would be dealt with — specifically referencing the *sufficiency of water* for both the irrigation of fire breaks and for the safety of all proposed structures.

To the extent SDCC relies on community members' concerns about the availability or cost of water, neither influences our analysis. At best these concerns are evidence that merely supports a different finding; they do not establish a lack of substantial evidence in support of the Addendum. (*Howard*, *supra*, 72 Cal.App.4th at p. 631.)

Accordingly, SDCC did not meet its burden of establishing a lack of substantial evidence to support the 2013 Project's deletion (based on a lack of need) of the water reclamation system.

b. *Traffic*

SDCC argues that the administrative record does not contain substantial evidence to support the following statement in the Addendum: " 'The amount of development, and therefore, trip generation and associated impacts on public roads are similar or less than that previously analyzed and approved.' " We note that SDCC did not include the sentence immediately prior to the quoted statement, by which the County limited its

34

finding to the intersection of Calle Ambiente and Del Dios Highway outside the gates of the residential community.[19]

Initially, both the 1981 EIR and 1984 SEIR concluded that "traffic impacts were less than significant, with mitigation," and by the time of the review of the 2013 Project, all traffic-related mitigation measures identified in the 1981 EIR and 1984 SEIR had been completed — thereby evidencing "less than significant" traffic impacts. Second, as SDCC acknowledges, neither the Village Center nor 24 of the previously approved residential units would be constructed under the 2013 Project. Third, the uses originally proposed for the Village Center were relocated either to the expanded Neighborhood Commercial Center or to other areas within the gated community. Finally, the impacts to Del Dios Highway (outside the gates, near the Neighborhood Commercial Center) were deemed to be the same as in the EIR and SEIR; i.e., although there were impacts, they would not change based on the 2013 Project.

---

[19]    The County's presentation of the finding challenged by SDCC was limited to one intersection and provides in part:  "The [2013 P]roject's traffic has been analyzed under the [1981 EIR]. [Two provisions of the 2013 Project propose 24] residential lots, respectively.  The overall [Amended] Specific Plan anticipated the development of *42 V*[*illage* ]*E*[*state*] *units and a Village Commercial site, which would produce more traffic than currently proposed. This development does not change the expected impacts or mitigation measures anticipated for the total project operation, at the intersection of Calle Ambiente, with the Del Dios Highway, all of which were analyzed in the EIR*.  The amount of development, and therefore, trip generation and associated impacts on public roads are similar or less than that previously analyzed and approved.  The original 1981 [EIR] analyzed 892 dwelling units and 20 acres of commercial development.  That project generated 13,420 average daily trips (ADT). The analysis showed direct impacts to the Del Dios Highway . . . ."  (Italics added.)

SDCC considers "simplistic" the County's evidence that, because the 2013 Project proposed the deletion of the Village Center and a reduction of residential units from 42 to 24, less traffic will be generated. In so doing, SDCC does not attempt to explain how or why this evidence is simplistic or insubstantial; nor does SDCC mention any other evidence (let alone attempt to establish its insubstantiality) in support of the County's finding. SDCC merely suggests that the County should have required an updated traffic study.

For these reasons, SDCC did not meet its burden of establishing a lack of substantial evidence to support the County's finding that the proposals in the Seventh Amendment did not generate more substantial or severe impacts to traffic than were analyzed in the EIR and SEIR.

c.    *Fire Safety*

SDCC complains that, despite evidence from residents regarding the risks associated with fire safety in the Development, the only condition for approval of the Amendment was the installation of automation that would open all gates in the event of an emergency. SDCC's criticism fails to account for the evidence presented in August 2013 in direct response to concerns that had been raised as to fire safety protection.

In writing, the County staff advised the Board:

"a.    Background

"The [2013 P]roject is located within the Rancho Santa Fe Fire Protection District (District). The [D]evelopment was designed and built as a 'shelter-in-place' community, which means that the [Amended] Specific Plan is designed to provide a shelter for use during wildfire events and that construction is high quality and fire resistant. It allows residents to remain

36

within the [Amended] Specific Plan area, during a wildfire event if necessary. In addition to being a shelter in place community and having direct access to Del Dios Highway, secondary access is provided by access to Mount Israel Road to the east, Harmony Grove Road to the north, and Camino De Arriba to the east. These roads are currently paved and maintained, as well as accessible to all residents of the project.

"b.    Fire Protection Plan

"[Rancho Cielo] prepared a *Fire Protection Plan (FPP) that was approved by the both the County Fire Authority and the Rancho Santa Fe Fire Protection District*, on January 2, 2013 and January 23, 2013, respectively. The FPP identifies that the project design does not exceed the required dead-end road length and the availability of secondary access points for use by residents in the case of an emergency event.

"To further alleviate the concerns related to emergency access, the tentative maps will each include a condition of approval to install an automatic gate opener at the main access guardhouse, at Calle Ambiente. This opener will automatically open all gates to the project during times of emergency; *particularly, during wildfire events. This project complies with the County requirements for adequate fire protection.*" (Italics added.)

Consistently, at the August 2013 meeting, a County staff member orally summarized:

"The [2013 P]roject was reviewed by the County fire authority and local fire protection district. *The project complies with the County fire code and provides adequate defensible space and access.*" (Italics added.) Finally, as established in part II.B.3.a., *ante*, the record also contains substantial evidence of the sufficiency of water for the irrigation of fire breaks and for the safety of all proposed structures.

Accordingly, SDCC did not meet its burden of establishing a lack of substantial evidence to support the County's finding that the 2013 Project would not significantly impact fire safety.

37

4.      *SDCC Did Not Meet Its Burden of Establishing Reversible Error Based on a Significant Error in the Addendum*

SDCC contends that because the Addendum failed to accurately state the existing zoning of parcel VC, the County's analysis of the 2013 Project's impacts is fatally flawed. We disagree.

We accept for purposes of this argument (and Respondents do not challenge) SDCC's representation that at all times prior to the approval of the Amendment and Addendum in August 2013, parcel VC was zoned C-36 for commercial and civic uses.  In fact, as County staff properly disclosed to the Board at the August 7, 2013 meeting prior to which the Board approved the Amendment and Addendum, at that time the current plan and zone allowed only for commercial development on parcel VC — with townhomes as a possible secondary use incidental to commercial development on parcel VC.

Nonetheless, SDCC directs our attention to a 25-page, June 12, 2013 Environmental Review Update (which was part of the Addendum) that provides on page 7 that the "*current plan and zone allow for a total of 24 dwelling units across two sites,*" one of which is parcel VC.  (Italics added.)  Inconsistently, earlier on page 4, the update correctly reported that "parcel [VC] was previously designated and zoned for a village commercial center."  Thus, the italicized language was not accurate:  The then-current relevant plan and zone (1) designated parcel VC commercial and civic, and (2) allowed for 42 residential units on parcel H; and the 2013 Project then under consideration proposed reducing the number of residential units to 24 (17 on parcel H and

38

seven transferred to parcel VC). Based on this error, SDCC contends that the Board approved a rezoning (of parcel VC to allow for the seven residential units) "without due consideration of the internal and external traffic and public safety impacts."

Respondents argue that SDCC forfeited our consideration of this issue by raising it for the first time on appeal. (§ 21177, subd. (a); *Sea & Sage*, *supra*, 34 Cal.3d at p. 417.) In reply, SDCC refers us to portions of the administrative and trial court records where challenges were made to the representations regarding the zoning of parcel VC. While the exact argument there is not the argument SDCC has now crystallized on appeal, we exercise our discretion to consider it on the merits.

We agree with Respondents that, given the entirety of the record, the error pointed out by SDCC is not significant. *Other than the June 12, 2013 Environmental Review Update*, SDCC has not directed us to any statement in or related to the Amended Specific Plan or the Seventh Amendment — or anywhere else in the 34,808-page administrative record — where the zoning on parcel VC was other than commercial and civic use (C-36). Indeed, elsewhere in the Addendum and in the August 7, 2013 documentation presented to the Board in support of the Seventh Amendment and Addendum — including in a live power point presentation — the zoning for parcel VC was accurately described as commercial and civic use under the C-36 designation.

To the extent SDCC suggests that a specific plan amendment is necessary to allow residential development on (and thus a reallocation of residential units to) parcel VC, we disagree. Parcel VC has been entitled to develop up to 40 dwelling units per acre since the 1981 EIR. Moreover, the Seventh Amendment expressly provides for a rezoning of

39

parcel VC to residential units. Indeed, given that the Board approved the zoning change for parcel VC at the same meeting as approving the Addendum, we are not persuaded that the error on page 7 of the June 12, 2013 Environmental Review Update adversely affected the process.

SDCC has provided only rhetoric, not legal authority, for the proposition that allocation of units from one parcel to another, even where such allocation requires a change in zoning, cannot be accomplished under CEQA by way of an addendum under section 21166. In contrast, in *Benton v. Board of Supervisors* (1991) 226 Cal.App.3d 1467, the county properly approved a new use permit under section 21166 and an addendum where new use required a rezone from agriculture uses to a commercial winery. (*Id.* at pp. 1473 & fn. 3, 1476.)

In any event, SDCC has not attempted to demonstrate prejudice from the error, and "there is no presumption that error is prejudicial." (§ 21005, subd. (b).) " ' "Noncompliance with CEQA's information disclosure requirements is not per se reversible; prejudice must be shown. " ' " (*Rominger v. County of Colusa* (2014) 229 Cal.App.4th 690, 709 [noncompliance with 30-day public review period not prejudicial].) Thus, even if we assume significant error in the June 12, 2013 update, SDCC has not met its burden of establishing reversible error.

Accordingly, the error on the June 12, 2013 Environmental Review Update is insufficient to establish a significant error in the Addendum; and, regardless, SDCC has not established prejudice that resulted from the error.

DISPOSITION

The judgment is affirmed.

_____
IRION, J.

WE CONCUR:

_____
McCONNELL, P. J.


_____
O'ROURKE, J.